IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 10, 2016

**RANDALL COLEMAN v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2011-B-1027      Cheryl Blackburn, Judge**

_____

**No. M2015-01174-CCA-R3-PC – Filed January 10, 2017**

_____

The Petitioner, Randall Coleman, appeals the Davidson County Criminal Court's denial of his petition for post-conviction relief from his convictions of one count of rape of a child and five counts of aggravated sexual battery and resulting effective sentence of fifty-five years. On appeal, the Petitioner contends that he received the ineffective assistance of counsel at trial. Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Elaine Heard, Nashville, Tennessee, for the appellant, Randall Coleman.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Glenn R. Funk, District Attorney General; and Chad Butler, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In April 2011, the Davidson County Grand Jury indicted the Petitioner for one count of rape of a child, a Class A felony, and five counts of aggravated sexual battery, a Class B felony, for incidents that occurred between April 28, 2005, and February 14, 2007. The victim of the alleged crimes was J.R.,[1] who was born on April 28, 1997.

_____

[1] It is the policy of this court to refer to minor victims of sexual crimes by their initials.

The following relevant facts underlying the Petitioner's convictions, as stated in this court's direct appeal opinion, are as follows:

J.R. testified that she was . . . fourteen years old at the time of the trial. She said that she lived with her mother and that her brothers and sisters lived with their father. J.R. recalled that she often spent time at her grandmother's house, whom she referred to as "Granny." Her granny's given name was Charmaine Rowan. J.R. said that, at the time of these incidents, Rowan lived in a large, three-bedroom apartment in the Spring Branch apartment complex with the Defendant, whom she called Pawpaw, and their two children, Kevin Coleman and Keisha Coleman. J.R. testified that the Defendant was like a grandfather to her.

While the Defendant and her granny lived at the Spring Branch apartment, J.R. visited the Defendant and Rowan frequently, as the apartment was close to J.R.'s school. On one occasion when she was at the apartment, she was on an air mattress between Kevin Coleman and the Defendant. Kevin Coleman kept scooting "his butt" back, in a playful manner, causing J.R. to scoot back also. She recalled that, as she was scooting back, the Defendant moved toward her. When the Defendant moved toward her, his "private part" touched her buttocks. Upon contact with the Defendant's body, the victim scooted away from the Defendant and back toward Kevin Coleman.

J.R. testified that, on another occasion, she was in Rowan's room asleep in the bed when the Defendant came into the room and pulled down her clothing. He then pulled down his own clothing, and put his "private part on [her] private part." J.R. said that, while her legs were spread apart, the Defendant touched his penis to the area where she "pee[d]." She described the Defendant as "going up and down." J.R. recalled that Rowan came in the main door to the apartment, so the Defendant pulled up his pants, and she pulled up her own pants.

J.R. testified about another incident when she was in Rowan's room, and the Defendant pulled his pants down. He told her to "touch it," and he grabbed her hand. He assisted her in "going up and down" on his penis. J.R. testified that nothing came out of his penis on this occasion.

J.R. testified about another incident that occurred while the Defendant lived at the Spring Branch apartment. She said that she was in Kevin Coleman's room. J.R. said she knew that something happened while

she was in that room, but she did not want to go into detail because she did not remember it clearly. J.R. said that there were other incidents that happened, but she did not remember them specifically.

J.R. said that the Defendant told her not to tell anyone "what [they had] been doing because," he said, "pawpaw can get in real big trouble."

J.R. recalled that, when she was ten or eleven years old, Rowan and the Defendant moved into a different apartment in "Hallmark at the Park." This apartment had two bedrooms, and the couple lived there with three children, including Kevin and Keisha Coleman. J.R. said that Keisha Coleman did not have her own room and stayed in the same room with the Defendant and Rowan.

J.R. testified that, on one occasion while the Defendant and Rowan lived at "Hallmark," the Defendant told Keisha Coleman to go and wash the dishes. After doing so, the Defendant pulled down his pants, pulled down J.R.'s pants, and pulled J.R. on top of him. J.R. said the Defendant put "his private part where [she] peed" and started moving up and down. J.R. said that she then got off of him.

J.R. testified about another incident at the Hallmark apartments. She said that she was alone in the apartment with the Defendant. She recalled that the Defendant pulled her pants down, pulled his pants down, and opened her legs, spreading them apart. He then put his "private part on [her] private part." The Defendant was "going up and down," until J.R. told him that she needed to go to the bathroom.

J.R. said that, while the Defendant and Rowan lived at the Hallmark apartment, J.R. told Keisha Coleman about the Defendant's sexual conduct toward her. J.R. asked Keisha Coleman to tell her mother. To J.R.'s knowledge, Keisha Coleman did not respond to J.R.'s request and did not tell J.R.'s mother.

J.R. said that, when she was approximately eleven or twelve, Rowan and the Defendant moved to a duplex in the Westchester area ("Tuckahoe Square"). This was a three-bedroom home. When J.R. was visiting the Defendant and Rowan at the Tuckahoe Square duplex, the Defendant was in the room with J.R. He pulled down his pants and told J.R. to "touch it." He then grabbed her hand with his hand and assisted her in rubbing her hand up and down his penis. J.R. said she believed that something came

out of the Defendant's penis on this occasion.

J.R. testified that, on another occasion, she was in the living room of the Tuckahoe Square duplex with Rowan and the Defendant. The Defendant told Rowan to go in her room, and Rowan complied with his request. The Defendant then pulled J.R.'s pants down and spread her legs apart. He then put his tongue in her private area and started licking her. The Defendant then put his private in that same place, and he "nutted in [her]." J.R. described the term "nutted," a phrase she said she learned in school, as meaning that "something" came out of the Defendant's penis onto the victim's vagina. J.R. said that after the Defendant finished, she went to the bathroom to wipe herself off and then went to Keisha Coleman's room to lay down.

J.R. said that, at some point, her mother asked her if anyone was touching her. J.R. did not respond, which indicated to her mother that J.R. was, in fact, being inappropriately touched. J.R.'s mother inquired further, and J.R. told her about the interactions with the Defendant. J.R. said her mother called the police.

J.R. said that she then went to the Child Advocacy Center, and a woman named "Latoya" interviewed her. She also underwent a medical exam at the clinic. After speaking with a police detective, J.R. agreed to have a telephone conversation with the Defendant while police officers taped the conversation.

. . . .

Keisha Coleman, the daughter of the Defendant and Rowan, testified that, while J.R. was her niece, the two were more like sisters and had been close most of their lives. She said that, until 2010, she lived with the Defendant and Rowan. Keisha recalled a time while living at the Hallmark apartment when J.R. told her that the Defendant had touched J.R. inappropriately. Keisha said that she never told anyone about J.R.'s statements until police contacted her about these allegations. When police asked her about the allegations, however, she told them that J.R. had previously disclosed this information to her. Keisha testified that she never noticed the Defendant being mean to J.R. and that the two seemed to get along fairly well.

During cross-examination, Keisha testified that J.R. usually slept in

bed with her when she spent the night at their home. She said that she and J.R. liked to "play tricks" on the Defendant, like waiting until he was asleep and putting tissue in his ears or running away from him. Keisha said that, even after J.R. told her about the touching, J.R. continued to sleep over. She said that she never saw anything inappropriate occur between the Defendant and J.R. while J.R. was at her home. She further testified that the Defendant had never touched her in an inappropriate manner.

During redirect examination, Keisha testified that there were times when the Defendant was alone on the bed with J.R. while the two watched television. She also said that J.R. had never accused anyone else of touching her inappropriately.

. . . .

[Detective Edmond Strickling] testified that, when investigating J.R.'s case, he first tried to corroborate her statements. Detective Strickling verified that the Defendant and Rowan had lived in the three places mentioned by J.R. He also attempted a "controlled phone call" where J.R. called the Defendant. The Defendant did not make any admissions during this telephone conversation, which the State played for the jury.

Detective Strickling testified that J.R. told him that she had told Keisha Coleman about the abuse. The detective located Keisha at school and interviewed her. Keisha corroborated J.R.'s account of the conversation. The detective testified that he interviewed the Defendant about J.R.'s allegations. The Defendant and the detective met at a Wal-Mart parking lot, and they sat together in the front seat of the detective's car. The detective told the Defendant he was not under arrest and that he was trying to get the Defendant's side of the story. The detective recorded his conversation with the Defendant. In the recording, the Defendant denied the allegations and agreed to submit to a DNA test.

Detective Strickling testified he contacted Rowan, who said she did not want to get involved in the case.

During cross-examination, Detective Strickling confirmed that the Defendant repeatedly denied sexually abusing J.R. during the controlled phone call. He further said that, during his interview in the car with the Defendant, he told the Defendant that J.R. had undergone a medical examination and that some DNA may have been recovered. The detective

said the Defendant became "apprehensive" and inquired about what evidence police had found. The Defendant then provided the detective with a DNA sample. During this conversation, the Defendant never changed his denial of any sexual contact with J.R. During redirect examination, the detective stated that, while the Defendant repeatedly denied J.R.'s allegations, there were some inconsistencies and problems with his story.

Rowan, J.R.'s grandmother . . . , testified that she had two children with the Defendant, Keisha and Kevin Coleman. She said she and the Defendant had lived together for twenty-five years, moving on several occasions. Throughout J.R.'s childhood, J.R. spent a fair amount of time at her home. She said that there were times that the Defendant was home alone with J.R., whom J.R. called "Pawpaw."

Rowan testified that she learned about J.R.'s allegations when Keisha came home from school one day and said that police officers had asked her questions about J.R. and the Defendant. Rowan said, upon hearing this, she was angry and cried. She asked the Defendant "why," and the Defendant denied the allegations. Rowan said she asked the Defendant about the allegations daily. She implored him to tell the truth, and the Defendant eventually told her that "[J.R.] wouldn't leave him alone." Rowan interpreted this statement as an admission that the Defendant had molested J.R. Rowan said she told the Defendant she was going to tell the detective, and he told her that she "better not." This made Rowan scared because she "didn't know what he was going to try to do." She, therefore, never contacted the detective.

Rowan testified that the Defendant told her that J.R. had called him on the phone. He told Rowan that they "think he's stupid." Rowan understood the Defendant to mean that the detective thought he was stupid. Rowan again believed this was the Defendant's confirmation that the allegations were true.

Rowan said that someone from the public defender's office contacted her requesting to speak to Keisha and Kevin. Rowan allowed him to come to her home and speak with them.

During cross-examination, Rowan described her shared residences with the Defendant as "medium" sized. She said she never saw anything in the way that J.R. interacted with the Defendant that raised suspicion. Rowan agreed that J.R. had also spent the night at the home of one of

[J.R.'s mother's] girlfriends. The girlfriend had two young sons, both of whom were close in age to J.R. Rowan said she had previously described the two boys as "nasty" and had expressed her belief that J.R. should not spend the night there.

Rowan agreed she may have told the investigator that her family had threatened to "turn on [her]" if she sided with the Defendant. She also told the investigator that there had been "trouble" within her family because she and the Defendant had never been married. She also told the investigator that "maybe" the Defendant was just "playing" with J.R., and J.R. misunderstood his actions.

Rowan agreed that she had never disclosed her conversations with the Defendant during which he seemed to acknowledge the truth of J.R.'s allegations. The first time she mentioned these conversation was during the trial.

During redirect examination, Rowan testified that, after her conversations with the Defendant when she understood him to be admitting to molesting J.R., she made him leave their home. She never allowed him to return.

Sue Ross, a pediatric nurse practitioner at Our Kids' Center, testified as an expert witness in the area of pediatric nursing and forensic pediatric examinations. She said that the examinations at the Our Kids' Center normally took between one and three hours. During this time, a nurse practitioner would take a medical history from the victim and also conduct a physical examination. Ross said another nurse practitioner, one who was no longer employed with Our Kids, examined J.R., but Ross had reviewed the report.

The report included J.R.'s medical history. She told the nurse that the Defendant had touched her private parts. She said the first time was while she was on an air mattress with Kevin Coleman and that the Defendant had pushed his penis up against her buttocks. She then told the nurse about a second incident where the Defendant went into her room at her granny's house and pulled down her pants and then pulled down his own pants. She said that the Defendant touched her on her private area but that his penis did not go inside of her. J.R. told the nurse that, each time the Defendant had touched her, he pulled down her pants. She said that she did not think that his penis had ever gone inside of her. J.R. told the nurse

about another event where the Defendant put her on his lap and "made [her] move up and down on him."

The nurse's report indicated that J.R. said she did not tell her mother because she was "scared." J.R. described an encounter that occurred while the Defendant lived in the Hallmark apartment where he made her "jack him off." J.R. described the final incident with the Defendant during which the Defendant performed oral sex on her, putting his "tongue on [her] private part." The Defendant then again made her go back and forth on his private, but he never put his private inside of her. J.R. said she never saw anything come out of the Defendant's penis. She also said she felt better once she told her mother about the abuse. Nurse Ross said the report also indicated that J.R.'s medical examination was normal, which was consistent with the type of abuse she alleged.

During cross-examination, Nurse Ross agreed that the "medical history" taken is an oral history from the victim. This information may, or may not, be true.

State v. Randall Coleman, No. M2012-01285-CCA-R3-CD, 2013 WL 4033669, at *1-8 (Tenn. Crim. App. at Nashville, Aug. 8, 2013), perm. to appeal denied, (Tenn. Dec. 11, 2013).

At the conclusion of the proof, the State made an election of offenses, and the jury convicted the appellant as charged of one count of rape of a child for his having oral sex with the victim at the Tuckahoe duplex and five counts of aggravated sexual battery for his putting his private on her private in her grandmother's bedroom at the Spring Branch apartment; for his grabbing her hand and making her touch his penis in her grandmother's bedroom at the Spring Branch apartment; for his putting his private on her private after he sent Keisha to wash dishes at the Hallmark apartment; for his putting his private on her private while they were alone at the Hallmark apartment; and for his ejaculating on her at the Tuckahoe duplex. After a sentencing hearing, he received an effective fifty-five-year sentence. Id. at *9.

On direct appeal of his convictions to this court, the Petitioner alleged, in part, that the evidence was insufficient to support his convictions due to discrepancies between the victim's testimony and what she told the nurse practitioner. Id. at *9. The Petitioner also alleged that his effective sentence was excessive. Id. at *11. This court found the evidence sufficient, noting that the jury resolved issues of credibility in the State's favor, and that the trial court properly sentenced the Petitioner. Id. at *10, 12.

After our supreme court denied the Petitioner's application for permission to appeal, he filed a timely petition for post-conviction relief. Relevant to this appeal, the Petitioner claimed that trial counsel was ineffective for failing to cross-examine the victim, for failing to object to Nurse Ross's testimony, and for failing to confer with him about "case strategy and other information." The post-conviction court appointed counsel, and counsel filed an amended petition, additionally alleging that trial counsel was ineffective because trial counsel "requested a break [after the State's direct examination of the victim and] then allowed the State to go back after it had finished questioning the victim to prove the Rape of a Child count which it had most likely failed to do before."

At the evidentiary hearing, the Petitioner testified that he was represented by lead counsel and co-counsel at trial but that lead counsel was primarily responsible for his case. At first, the Petitioner and lead counsel had a good relationship. However, when the Petitioner asked lead counsel for a copy of the Petitioner's motion for discovery, lead counsel "denied" his request. Lead counsel never told the Petitioner why he could not have a copy. Lead counsel told the Petitioner that the victim had claimed on three separate occasions that the Petitioner threw her onto an air mattress and raped her. The Petitioner said he thought the victim made that claim in a police report. When the Petitioner finally received a copy of the report in discovery, though, a page appeared to be missing. The Petitioner stated, "I'm thinking that the page that was missing is what he told me what the child said." The Petitioner questioned lead counsel about the missing page, and lead counsel said that "it's not in there." The Petitioner said he did not ask lead counsel anything else about the missing page because "I knew right there and then . . . he wasn't going to be a good attorney for me."

The Petitioner testified that lead counsel never mentioned an eight-year plea offer by the State. In any event, he would not have accepted any offer because he was innocent. Before trial, lead counsel gave the Petitioner a copy of the victim's statement and asked the Petitioner to highlight things he thought counsel should cross-examine the victim about. The victim had said things "a seven-year old wouldn't say," and the Petitioner wanted lead counsel to cross-examine her about them. However, counsel did not cross-examine the victim. The Petitioner asked lead counsel why he did not cross-examine her, and lead counsel said he did not want the victim to "get up here and tell everything you done to her." The Petitioner said that had counsel cross-examined the victim, "I probably wouldn't be sitting up here right today."

The Petitioner testified that after the State finished its direct examination of the victim, lead counsel asked for a recess. After the recess, the State asked to continue questioning the victim. The trial court allowed additional questioning, which upset the Petitioner. The victim's grandmother, who was the Petitioner's girlfriend, knew the

victim's allegations were false but testified against the Petitioner at trial because her family threatened to disown her. Thus, she had no choice but to "side" with the State. An expert witness, Sue Ross, also testified for the State. The Petitioner asked lead counsel why the defense did not have an expert testify, and lead counsel said they did not need one. Nurse Ross should not have been allowed to testify about the victim's statement because she did not take the statement from the victim.

The Petitioner testified that lead counsel "did come and see me quite often" in jail but that "it was more like he just misled me." For example, lead counsel told the Petitioner that he had watched a video recording of the victim's interview and that she looked like she was lying. However, lead counsel did not play the video at trial. After the Petitioner's sentencing hearing, lead counsel told the Petitioner that he was sorry and asked the Petitioner's age. When the Petitioner told lead counsel that he was fifty years old, lead counsel said that "you just going to have to die in prison." Lead counsel also made a list of things trial counsel did not do properly and gave it to the Petitioner. The handwritten list, titled "Things we didn't do right," was introduced into evidence at the hearing and provided as follows:

> (1) didn't explain what happens at trial
>
> (2) didn't tell me they could read from medical report
>
> (3) didn't ask permission to let nurse read from medical report instead of social worker who took statement
>
> (4) didn't spend enough time talking to me about whether or not to testify
>
> (5) didn't file pretrial motions [and]
>
> (6) didn't discuss details of plea offer[.]

The State did not cross-examine the Petitioner at the evidentiary hearing.

Lead counsel testified that he had been licensed to practice law since 1998, that 100% of his practice involved criminal law, and that he had handled "[p]robably thousands" of criminal cases. For five years, lead counsel was an assistant public defender, was the "team leader" in Davidson County Division III Criminal Court, and "more or less oversaw all the cases." He said that he had probably tried more than twenty cases but that the Petitioner's case was the first child sex abuse case he tried. Lead counsel met with the Petitioner regularly in jail, and they usually had lengthy discussions.

Lead counsel talked with the Petitioner about the charges, possible defenses, and possible punishments.

Lead counsel testified that the Petitioner claimed from the beginning that he was innocent, and the defense was going to focus on whether the victim's allegations were true, whether someone else abused the victim, or whether "she was making this up for whatever reason." Counsel filed pretrial motions such as a motion for a bill of particulars and a request for discovery. Counsel received discovery, and lead counsel went over all discovery materials with the Petitioner. The State allowed lead counsel to watch the victim's recorded interviews at the district attorney's office, but the State did not allow him to transcribe or view the interviews outside the office. The interviews were not played at trial. The Petitioner assisted with his defense, and the defense had an investigator. The State made a plea offer for "eight at thirty percent," and lead counsel conveyed the offer to the Petitioner. However, the Petitioner was not interested in pleading guilty.

Lead counsel acknowledged that he did not cross-examine the victim. He explained,

> I thought her testimony during trial was somewhat vague. She didn't remember certain things. She talked about some incidents she really couldn't describe. And my thought was if I start cross-examining her, number one, she could clarify some of these allegations and make it worse. And also -- I also would open the door to the State being able to possibly play, you know, or introduce prior consistent statements, that kind of thing. So I thought cross-examining her would just make -- make the situation worse for Mr. Coleman. And I also thought the jury -- that there's a risk of offending the jury. And, you know, I think our hope at trial was for him that she wasn't -- you know, that because she was so vague maybe people would think, oh, she's not telling the truth because she really can't describe what happened. And my -- my gut feeling was rather than keep her on the stand and have her talk more about things it might be better to just let be what was said and move on. . . . So it was really a strategic decision.

Counsel did not call any defense witnesses to testify but "tried to point out during cross-examination of other witnesses that there were inconsistencies in [the victim's] statement, that kind of thing." Lead counsel said he did not know of any questions from the Petitioner that lead counsel did not address or answer.

On cross-examination, lead counsel testified that prior to the victim's testimony, he had planned to cross-examine her. However, after her direct testimony, he asked for a

recess in order to think about whether he should cross-examine her. After the recess, the State requested to ask the victim additional questions. The trial court allowed the State to do so because the defense had not yet started its cross-examination of the victim. Lead counsel acknowledged that the after the recess, the State "went back and questioned her thoroughly" and "hit home on" whether the Petitioner had penetrated her. Lead counsel said that he did not ask for the recess "to allow the State to improve their case" but that the recess could have changed the case because it "did allow them prior to my cross-examining to be able to ask the Court to ask more questions." Lead counsel said that maybe he should have objected to Nurse Ross's reading the victim's statement but that he thought he would have been overruled because she was reading from a medical report. Before trial, the victim's grandmother told defense counsel that she did not think the Petitioner abused the victim. However, at trial, she testified that the Petitioner made some admissions to her. Counsel tried to impeach the victim's grandmother. Lead counsel said that he did not withhold any discovery materials from the Petitioner and that, "[i]f there was a missing page, it was nothing I withheld. It would have been just maybe the pages were numbered wrong or that was never provided to me."

Lead counsel acknowledged giving the Petitioner the list titled "Things we didn't do right." He explained as follows:

> I remember talking to him and saying that one of his options -- one of the avenues he could pursue is post conviction. And I said that I cannot represent him on that obviously because I'm the attorney who would be post convicted. . . . But the areas he may be able to look at in terms of post conviction, the areas that there may be some issues at post conviction, were these areas. And I wrote them down for him. I think I talked about them. And he said, can you write them down, and I did.

In a written order, the post-conviction court denied the petition for post-conviction relief. Regarding the Petitioner's claim that trial counsel failed to communicate with him, the court noted that the Petitioner claimed lead counsel withheld a page of the police report from him but that the Petitioner testified counsel met with him regularly, had him examine the victim's statement, and had him highlight portions of the statement to assist counsel on cross-examination. The court also noted that lead counsel testified that he reviewed all of the discovery materials with the Petitioner and that they discussed the charged offenses, the possible punishments, and the State's plea offer. The court accredited counsel's testimony over that of the Petitioner.

As for trial counsel's failure to object to Sue Ross's reading the victim's statement, the court noted that lead counsel testified that he did not object because case law allowed nurses and social workers to read from a victim's medical report, even if

someone else took the information from the victim. The court agreed with lead counsel, citing State v. Hunter, 926 S.W.2d 744, 747 (Tenn. Crim. App. 1998). As for trial counsel's failure to cross-examine the victim, the court found that counsel made a strategic decision not to cross-examine her so that she could not clarify her direct examination testimony, so that he would not open the door to the State's introducing any prior consistent statements, and so that he would not risk offending the jury.

## II. Analysis

On appeal, the Petitioner claims that he received the ineffective assistance of trial counsel because counsel failed to cross-examine the victim, "and in exacerbation of that problem, . . . requested a recess at the conclusion of the prosecution's direct examination of the victim, which allowed the prosecution a 'study period' of sorts to realize that they had neglected to put on proof regarding penetration." He argues that cross-examination of the victim was necessary because she was the only witness to testify about the abuse and because there was no physical evidence of any abuse. He also argues that counsel should have objected to the State's being allowed to continue its direct examination of the victim after the recess. Finally, the Petitioner claims that he received the ineffective assistance of counsel because counsel failed to provide him with an inculpatory statement made by the victim and failed to object to Nurse Ross's reading the victim's statement to the jury when she did not take the statement from the victim. The State argues that the Petitioner has failed to show that he is entitled to relief. We agree with the State.

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

- 13 -

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Generally, [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component. Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

Turning to the instant case, the Petitioner claims that trial counsel was ineffective for requesting a recess after the victim's direct examination testimony, which gave the State an opportunity to improve its case against him. Our review of the trial transcript confirms that after the State concluded its direct examination of the victim, lead counsel asked the trial court for a brief recess. When the parties returned to the courtroom, the State advised the trial court, "I just have a couple more questions that I want to ask before Mr. Coleman's lawyer starts asking questions." Lead counsel objected to the additional questioning on the basis that "they've closed," and the trial court overruled the objection. We note that a trial court may permit the introduction of further evidence after a party has rested. See State v. Chris L. Young, No. M2008-01255-CCA-R3-CD, 2009 WL 2877422, at *3 (Nashville, Sept. 9, 2009). Thus, the Petitioner has failed to show that counsel was deficient or that he was prejudiced by any deficiency.

As to the Petitioner's claim that counsel was ineffective for refusing to provide him with the victim's complete statement, lead counsel testified that he gave all discovery materials to the Petitioner and that he did not withhold any page of the victim's statement. The trial court accredited his testimony, and the Petitioner has not presented any evidence that a page from the victim's statement was missing. Thus, he has failed to show that he is entitled to post-conviction relief.

Regarding the Petitioner's claim that counsel was ineffective for failing to object to Nurse Ross's reading the victim's statement when she did not take the statement from the victim, the trial court correctly cited Hunter. In that case, this court held that Nurse

- 14 -

Ross's "'hearsay within hearsay'" testimony about a victim's statements to a social worker were admissible under Tennessee Rule of Evidence 803(4), the hearsay exception for statements made for the purpose of medical diagnosis and treatment, and Rule 803(6), the hearsay exception for business records. Hunter, 926 S.W.2d at 747. Accordingly, the Petitioner again has failed to show that he is entitled to post-conviction relief.

The Petitioner's claim that counsel was ineffective for failing to cross-examine the victim, however, is more concerning. We have carefully reviewed the victim's trial testimony and compared it to the statement she gave to the nurse practitioner at Our Kids. Some of the victim's testimony was inconsistent with the statement. For example, the victim testified at trial about two incidents, one at the Spring Branch apartment and the other at the Tuckahoe duplex, in which the Petitioner put her hand on his penis and made her rub it up and down. However, she told the nurse practitioner that the Petitioner grabbed her hand and made her "jack him off" at the Hallmark apartment. In addition, the victim told the nurse that the Petitioner put his private on her private "in my room at granny's" but did not say anything about an incident in her room at trial. The victim also told the nurse that she never saw anything come out of the Petitioner's penis. However, she stated at trial that he ejaculated on her at the Tuckahoe duplex and that she thought something came out of his penis when he put her hand on it at the Tuckahoe duplex.

Lead counsel testified that he had planned to cross-examine the victim but that he decided after her direct testimony not to question her because he did not want to give her an opportunity to clarify her direct examination testimony, did not want to open the door to prior consistent statements, and did not want to risk offending the jury. Lead counsel stated that although he did not cross-examine her, he "tried to point out during cross-examination of other witnesses that there were inconsistencies to her statement, that sort of thing." Lead counsel did not offer any examples, though, of how he pointed out those inconsistencies through other witnesses. We note that lead counsel's cross-examination of Nurse Ross was brief, spanning just one and one-half pages of the trial transcript, and that he did not use his cross-examination of her to address the victim's inconsistencies. Lead counsel briefly addressed the inconsistencies during closing argument, noting that the victim told the nurse practitioner that nothing ever came out of the Petitioner's penis but testified at trial that he ejaculated on her at the Tuckahoe duplex.

Our supreme court has stated that courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Here, the post-conviction court found, and we agree, albeit barely, that lead counsel made a strategic decision not to cross-examine the victim. Moreover, even if we were to conclude that counsel was deficient for failing to cross-examine the victim, the Petitioner would have to show that he was prejudiced by the deficiency. The State's case, while not overwhelming, was strong. The victim

maintained for an extensive period of time that the Petitioner abused her, and her testimony at trial was mostly consistent with her statement to the nurse practitioner. Particularly damaging to the Petitioner was his own daughter's corroboration of the victim's testimony that the victim told her about the abuse while Rowan and the Petitioner still lived in the Hallmark apartment and Rowan's testimony that the Petitioner claimed that the victim "wouldn't leave him alone." Thus, we cannot say that the Petitioner was prejudiced by any deficiency and conclude that he is not entitled to relief.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE